Good morning, Your Honor. May it please the Court. I'm Charles Nicolapurin for the petitioner Rogelio Toj-Culpatan. This is a case in which the Board of Immigration Appeals issued a summary decision affirming the immigration judge's findings that the petitioner, who is a Guatemalan Mayan Indian, was barred from applying for asylum under INA Section 208A2B of the Immigration Nationality Act and the alternative failed to establish a nexus between the harm he suffered and the ground protected under the laws governing asylum applications. The threshold question in the petition to this Court was whether the Court had jurisdiction to review the agency's determination regarding an exception to the one-year filing rule, those being changed circumstances or extraordinary circumstances which prevented the filing within a year. Subsequent to the briefs which were filed in this matter, the Ninth Circuit ruled that the Real ID Act, that under the Real ID Act the Court has jurisdiction to decide extraordinary circumstances as a question of law and also can review both pure statutory interpretations and undisputed facts. Those cases are Ramadan v. Gonzalez, 479 F. 3rd, 646 Ninth Circuit, 2007, and Husbe v. Mukasey, 528 F. 3rd, 1172 Ninth Circuit, 2008. The Real ID Act states that the courts do have jurisdiction to review constitutional claims or questions of law. Now, in this case, there is a constitutional issue brought up as far as due process. The immigration judge acknowledged in her decision that Petitioner's request for an exception to the one-filing rule was close or at least closer than that of his brother. The application was filed 18 months after the Petitioner entered the United States. He entered the United States around February 1st, 1998, and he was detained shortly thereafter. And in this case, his late filing was really caused by his incarceration, a language barrier, lack of counsel. Kennedy. His incarceration lasted two months. Okay. If we give him credit for two months, he's still 16 months. Right. Which is four months late. Yes. Number one. Number two, do we have any cases that say that a person is incapacitated from filing papers whilst he's in detention? No, but in this case, he did file papers. In Spanish. He attempted. He attempted. He was given a he was handed an application in English. The judge who knew that he could only speak to a Spanish interpreter said you have to fill this out very quickly. Those were his words in English. He did his best. He had the right number of copies. He came. He had an attorney who appeared by telephone who said that he would help him. In the interim. When did he first have counsel? That was at the hearing on April 16th, 1998. How long was that after he had entered the country? A month and a half. I mean, two and a half months. Two and a half months. And then. Is there any reason why counsel couldn't have had this application for asylum translated? Well, he was going to. They reset the hearing in Eloy, Arizona for May 14th that year, short period. In the interim, a change of venue was granted. So the case went to San Francisco. The very next hearing that took place was September 7th, 1999. It was a master calendar hearing here in San Francisco. One thing that's. And he filed his asylum application at that hearing. He couldn't have filed it prior to a hearing before the immigration court. An asylum application can't be filed at the court window like you can with other applications, such as for cancellation of removal or adjustment of status, because the judge is required to give an advisal regarding the consequences of filing a frivolous asylum application. So he filed the application at the very next opportunity. And the court set the hearing on its calendar. And so he appeared at the very next hearing and filed it. So. Did he seek an earlier hearing on grounds that he would exceed the 12-month filing period? No. I don't have information that he did. He did have a lawyer. Right. It just seems very hard to find any kind of abuse on the board's part. I mean, when he has a lawyer with, if I have my math right, about nine and a half months left in his period. He's told what to do. He has a lawyer helping him. And he doesn't do it. I mean, if this is not, you know, I can't imagine what the 12-month period means if this is not a situation where it's enforced, or it's a statutory period. Yeah. Generally, extraordinary circumstances have, you know, under ACFR Section 208.4A5, they're listed, and it's not a complete list, but it includes serious illness, mental or physical incapacity, or legal disability, or an effective assistance of counsel. Did he argue an effective assistance of counsel before the board? No, he didn't argue that before the board. Did he file a, as he's required to, a complaint with the state bar? They did not do a LASADA motion against the. So we can't really consider this is not before us an effective assistance of counsel, right? Yeah. It wasn't presented to the agency, and so it's not really something we can consider, is it? We don't know that counsel was ineffective. I mean, it's entirely possible that counsel was perfectly effective, told him to do it. I mean, there are facts that we don't know anything about.  But, I mean, I think that, you know, there are a number of factors which you don't always have in a case like this, where the person actually, you know, presented his case to the judge. The judge handed it back to him. You know, there was an attempt on his part. He followed his counsel's advice. The court set the hearing, and the attorney may have just viewed that as meeting the exceptional circumstance and that, you know, his case was moved. But, you know, I think that there are a number of factors, and I think the most important is that the attorney presented his case. He attempted in good faith to file, and at the very next time that he had an opportunity to file, he presented his full application and it was accepted by the court. Mr. Nicolette, let's go to merits. What was the past persecution which Rogelio, as opposed to his brother who's not here, suffered? Well, he was, his family suffered a great deal of harm. Now, in matter of Chen, you know, which is the board's leading case on past persecution, most of the harm happened to the father, not to Chen, the applicant. So you can look at family experiences in determining past persecution. And in this case, the father was told by guerrillas initially to help transport weapons, arms. He did this. He stopped. He was shot four times. Later, the persons wrote a symbol for a guerrilla organization on the door of the house. Thereafter, people who he believes were paramilitary or police type people came and tortured his older brother and mocked him, calling him, well, a pig Indian. There was certainly, you know, they indicated that his ethnic origin had some to do with their acts against him. Later on, his father disclosed to him who had shot him, and he had mentioned that to some people and his friends. Later on, that person was killed, and the family, who it turns out was involved very much with the police and were military commissioners and involved with the military, threatened him, and that, you know, they were going to check this out, and if he had anything to do with their relative's death, they were going to kill him. And that is when he decided to come to the United States. All right. Thank you very much. I'll reserve my remaining seconds for rebuttal. Thank you. Thank you. Good morning. May it please the Court, my name is Antoinette Barksdale, and I represent the United States Attorney General in these proceedings. And it is the government's position that the Court should deny this for lack of jurisdiction. It was not a timely file. It's a little bit hard to hear you, Mike. I'm sorry. Oh, I'm sorry, Your Honor. It is our position that this Court lacks jurisdiction to review the agency's finding of untimeliness. It is our position that there was no extraordinary circumstances, that Petitioner had counsel early on at each stage. Petitioner raised the detention as a reason for extraordinary circumstances. He was only in detention for two months, and he had counsel at his master hearing on April 16th. There was an interpreter where the judge explicitly said to him, according to the regulations you must file this asylum application in English, and there was a Spanish interpreter to interpret that information for him. He had counsel telephonically. Just a minute. The translator is appointed by the Immigration Court to translate the testimony in court. Is there any regulation or case or statement in the record that the judge instructed the translator to translate the petition for asylum from Spanish to English? No, I don't think there's anything on the record that he told him to translate the petition from Spanish to English, but the judge told him that it had to be in English. He told the petitioner that he had to translate it, but he didn't tell the translator, the government will pay you for your services in translating this from Spanish to English, and do so now. That didn't happen, right? Right, yes. Yes, that didn't happen. So there are three reasons that the Petitioner says. He says there was a language barrier because of his detention and because of a change of venue as to the reason why he did not file his application until 18 months after his entry point. It is our position that none of those reasons are extraordinary circumstances. He was only incarcerated for two months, and he had a lawyer during that time. The lawyer could have shared with him, thousands of applicants know that the application has to be in English. It says on the application on I-589 that it has to be in English. The third thing with respect to the change of venue, Respondent requested, Petitioner requested a change of venue to California because that's where he was living once he got out of the INS detention. So it's not a regulation that it has to be in English, it's only in the form? I'm sorry, Your Honor? There is no regulation that it has to be in English. It's only on the form, isn't it? It is on the form, but I believe our regulation 100.3 says that it has to be in English, and it is on our immigration form that it should be filed in English, Your Honor. Yeah, but if it were only on the form, that would trouble me. If there is a regulation, as you say, that requires it, that's different. Yeah, there is a regulation, 8 CFR 1003.3, that talks about that the application has to be in English, Your Honor. So is our position that there are no extraordinary... It just talks about it, or does it just say that it has to be in English? I believe it says that it has to be in English, Your Honor. So it is our position that there are no extraordinary circumstances here. He had counsel, he asked for the change of venue, counsel could have helped him out with the application, he had plenty of time, he was released after two months of being incarcerated, two and a half months of being incarcerated, he asked for a change of venue, and for those reasons there are not extraordinary circumstances, and it is our position that this court lacks jurisdiction to rule on that particular issue. Now, the second issue, the merits of withholding of removal. There's no evidence that compels a finding contrary that was reached by the IJA and the BIA. Substantial evidence supports the finding that petitioner is not eligible for mandatory withholding of removal, Ms. Barksdale. Yes, Your Honor. This petitioner as well as his brother were found credible, right? Yes, that's correct. So under our rules we have to credit their testimony as to what happened to them in Guatemala. Well, not the brother because he's no longer here, but as to Rogelio anyway, right? Yes, that's correct. Okay. So I just wanted to make that clear. Go ahead. Yeah, that's correct. We have to give their testimony credit. But there's no evidence on the record that compels a finding that petitioner has proved past persecution, or even if he, on account of a protected ground. The facts show that he was never beaten, detained, assaulted, or mistreated in any way. In fact, his father is still there. Petitioner might have something to do with the only thing on the record, Your Honor, is that the brother said to the petitioner, if we found out that you had something to do with the killing of our brother, we're going to get you. These facts do not rise to persecution and are more akin to a personal vendetta or retaliation. Not only that we're going to get you, we're going to kill you, isn't that it? Yeah, that's what they said, yes. And after they said that, petitioner stayed in the country for several months before exiting to come to the United States. And it is our position that that rises to a personal vendetta or retaliation. That's what that's akin to, not persecution. And there's no record evidence that compels a finding that he has a well-founded fear of future persecution. In fact, his dad has not been harassed and his dad has stayed and lived in Guatemala for months. Ms. Marksdale, there's no question the father was shot four times by people who were angry with him because he wasn't running guns for them any longer. And his, so he's claiming family, he's a member of a social group to a family that has been persecuted and will be persecuted because of his belonging to that family. What's wrong with that? Your Honor, it is our position if you look at the cases that petitioner cited in his brief where they talk about family, the facts are specific and they apply to mainly the petitioner and they targeted the family. Here we're talking about an isolated incident that happened to the brother, and then an incident that happened to the father. And we think that that does not rise to the level of a well-founded fear that he'll be persecuted if returned to Guatemala. You say an isolated incident. It was pretty significant. An incident for the father was not because he was shot in all the extermination so much so that he was disabled from ever working again. So it's isolated, but it was pretty significant. Yes, Your Honor. But when that happened, petitioner was only 12 years old. He later, he found out some 10 or 12 years later about that situation. His father shared it with him. He was 12 years old when that incident happened to his father. And his father shared that information with him some 10 years later what happened to him. And as a result, petitioner had a conversation with some friends about it. Are you conceding that the shooting of the father was persecution? I thought it was your position that that was sort of a business disagreement, that he had been doing gun running for them, and he stopped doing it, and so they wanted him to keep doing it. Yes. Was that persecution, or was that sort of a... Well, Your Honor... He wanted to get out of the business of running guns. Right, Your Honor, and that is our position, that he wanted to get out of the business. Initially he was in the business, and when he stopped and decided to get out of the business of running guns, these acts occurred to his father. So we're not denying that the acts did not occur to petitioner's father, but there's no nexus in relevant in connection to the persecution to the acts that occurred to petitioner's father with respect to petitioner. That's our position, that there's no well-founded fear that he would be persecuted if he were to return to Guatemala. Personal vendettas is not an objective ground for fear of future persecution. Grave harm and family member persecution, if those cases were within the target, petitioner here with respect to his brother's persecution and petitioner's persecution in those cases were the ones that failed. No evidence of past torture to petitioner, petitioner failed to prove he is more likely than not to experience torture by the government or with the consent or acquiescence of the government if he were to return to his country. The record contains no evidence that petitioner was even tortured anywhere and that he has a fear, and if he does have a fear, it's akin more to a vendetta, retaliation or personal revenge. And therefore, the government asks that this court lacks jurisdiction on the first issue and uphold the IJ's decision on the second. Thank you, Your Honor. Just briefly, I'd note that the asylum application contained the record 190 to 198. I didn't see any mention of an English language requirement, although there may be other things not in the record, at least the petitioner, at least the application that's filed for him doesn't mention that. I think this case is similar to De Loso v. Ashcroft, and that was cited. Are you then taking the position that the petition that he filed in Spanish was sufficient? I'm saying that it was his attempt to do it. He attempted to file it with the court. The judge handed it back to him, and I think that his attempt to make a timely filing is something which should be taken into account in the aggregate, all of the circumstances, the fact that he was detained, the fact that he didn't have anyone to interpret for him in the jail, the fact that his case was taken off the calendar and moved. You're not taking the position that when he handed over the application in Spanish, he had satisfied the requirement of filing it timely? No. They have to file an application in the English language. Yes. And, again, I mentioned De Loso v. Ashcroft, where it noted that the harm inflicted in part due to revenge, they looked at a mixed motive and noticed that the petitioner was also the son of a political opponent, and that he was harmed for that reason, too. I think that that was similar in this situation, where there was a political motive to harm the father, and it's related also to the harm of the son. It's not just a matter of vengeance. Thank you, Your Honor. The case was submitted.
judges: Kozinski, Hug, Bea